Ramey, Calhoun & Marsh, of Tyler, and O. H. Atchley, of Texarkana, Tex., for appellant.

Sid Crumpton, of Texarkana, Tex., and Ted Goldman, of Texarkana, Ark., for appellee.

## ST. LOUIS SOUTHWESTERN RY. CO. v. VARNELL.

### No. 4986.

Court of Civil Appeals of Texas. Texarkana.

Oct. 1, 1936.

Rehearing Denied Oct. 8, 1936.

SELLERS, Justice.

Jim Varnell brought this suit against the St. Louis Southwestern Railway Company to recover for personal injuries alleged to have been received by him while he was a passenger on one of defendant's motorbuses operated over its railroad for the purpose of carrying passengers. The negligence alleged by plaintiff to be the proximate cause of his injury, together with the injuries received, are: "The defendant, its agents and employees in charge of said bus or coach, and while said bus or coach was attempting to back into the Union Station in Texarkana, Bowie County, Texas, the point of this plaintiff's destination, negligently and carelessly and by their failure to keep a prop-

er lookout for the safety of this plaintiff, and without proper care, collided with another coach or bus of the defendant, which was standing at or near the station, thus throwing the plaintiff out of his seat and injuring his spinal column, bruising and spraining the ligaments and tendons thereof, injuring his shoulder and his hips and side by reason of such collision, and such was of sufficient force and his injuries were of such a nature that it shocked his nervous system, injuring his kidneys, causing him sleeplessness and such pain, from which he still suffers causing him mental anguish and physical pain, such injuries being permanent, from which he will never recover, to his damage in the sum of Three Thousand Dollars ($3,000.00)." Defendant in its answer, after entering a general demurrer, denied generally the allegations contained in plaintiff's petition, and specifically denied each of the allegations with reference to plaintiff's receiving an injury. The case was submitted to a jury and resulted in a verdict for plaintiff for damages in the sum of $750. From this judgment defendant has duly prosecuted this appeal.

Appellant's first ground of complaint is that the court erred in failing and refusing to submit to the jury the issue of unavoidable accident. In the recent case of Orange & Northwestern Ry. Co. v. Harris, 89 S.W. (2d) 973, the Supreme Court makes clear the rule to be followed in determining when the issue of unavoidable accident is raised. It was held: "Issue of 'unavoidable accident' is raised when there is evidence tending to prove that injury resulted from some cause other than negligence of parties." No contributory negligence on the part of appellee is alleged, and neither was there evidence of any conduct on his part which could have caused or contributed to cause the collision. The appellant by the jury's verdict was guilty of negligence. Under the foregoing rule announced by the Supreme Court, it is our duty to review the testimony to determine whether there is evidence which would tend to prove that the collision and injury was the result of some other cause than the negligence of the appellant. In reviewing the evidence it is well to remember that the rule requiring the highest degree of care is applicable in this case. Ft. Worth & N. O. Ry. Co. v. Enos (Tex. Civ.App.) 50 S.W. 595. The motorman in charge of the operation of the bus did not testify. The conductor on the bus testified for appellant, and it is on his evidence that appellant claims the issue of unavoidable accident is made. We quote from his evidence at length:

"Q. Now, when you got into Texarkana that day, I believe you went down to the 'Y' and then had to back into the Union Station? A. Yes, sir, we come down south of the tower and stopped, and when they give us the signal, I give the signal to back up.

"Q. Did you line that switch that day? A. No, sir, it is lined from the tower.

"Q. Some sort of mechanical device? A. Yes.

"Q. You stopped your motor coach and they gave you the signal to back on it? A. Yes, sir.

"Q. Where did you get? A. On the back end of the bus, because it backs from the tower into the station, and I was on the side the engineer was to give signals to the engineer.

"Q. State whether or not the engineer had any device in front of the coach that would aid him or permit him to see along the track as he backed up, without turning around and looking. A. Yes, sir, he had a looking-glass.

"Q. Up over his head there? A. Yes,— he could sit with his back to me and look in that looking-glass and see me.

"Q. And in that way catch the signals? A. Yes.

"Q. It wasn't necessary for him to turn around and look to get signals? A. No, sir.

"Q. The train backed on in there,— About where was this coach standing that it backed into? A. Well, if I remember correctly it was about where you would go up the steps there at the platform.

"Q. Near the steps? A. Yes.

"Q. At about what speed, according to your best judgment, was the motor coach traveling when it backed into this standing coach? A. Well, I should judge between two and three miles an hour, not over three,—he was pretty near stopped.

"Q. Before you got up to that standing coach, did you see the motor coach was getting close to the standing coach and should be stopped? A. Yes, sir.

"Q. What did you do? A. I give the slow signal, and later I give a stop signal.

"Q. The engineer,—Did he heed the stop signal? A. He was slowing down. After

I gave a stop signal, I thought maybe they would hit, and I jumped off or stepped off and hollered to him to stop.

"Q. He apparently didn't hear or didn't stop? A. No.

"Q. He backed into that coach? A. Yes. * * *"

Cross-examination:

"Q. About how far was that from the station or the point where you bring your motor to a stop? A. Well, it is quite a little ways, about a quarter of a mile, I would not be certain on that distance, but it is about that.

"Q. What is the condition of the track as to it being straight or crooked from where you began to back in? A. You turn to the left a little, and then swing to the right—it is crooked.

"Q. What is the condition of the track as to being straight or crooked from the point where the car would be brought to a standstill for the exit of passengers, what would be the condition of the track one hundred yards west of that point? A. You mean this side of there, before we got back to where we would stop?

"Q. Yes. A. It is straight there for quite a little ways, further than from here to the street.

"Q. Approximately how many yards? * * *

"Q. It would be fifty or one hundred yards? A. Yes, it would be that.

"Q. Is it possible. You know where you got off to get signals? A. Yes.

"Q. And got on your footboard? A. Yes, sir.

"Q. Is it possible to see the Union Station at that point? A. Well, of course I can see the station, but it isn't straight from there.

"Q. It isn't so much crooked? A. No, it isn't.

"Q. And that is about a quarter of a mile away? A. Yes, sir.

"Q. You say you hollered at the motorman,—when and how far were you from the coach with which collision was made when you hollered at the motorman? A. I don't suppose I was over fifteen or twenty feet, because he was going slow and I thought he would stop up to that time.

"Q. And you had no occasion to be alarmed or give signals,—you saw the coach? A. Oh, yes.

"Q. How far, Mr. Welsh, after you had started backing up and after you took your stand on that stepboard, did you notice that the coach was on the track on which you were backing in on? A. I saw quite a while before I gave a signal that there was a coach in there.

"Q. You saw for quite a while before you gave a signal that the coach was there—approximately what distance? A. I should judge about fifty yards.

"Q. You saw there was a coach or car on the track? A. Yes, sir.

"Q. On the track upon which you were backing in? A. Yes, sir.

"Q. You didn't give any signal then of danger? A. No, sir, not yet.

"Q. Based upon the assumption that you thought the motorman could see it? A. Yes, sir.

"Q. And you traveled on within twenty steps of it? A. No, I gave the slow signal when we got about a telegraph pole from this car.

"Q. You were still under the assumption the motorman could see and did see the coach? A. Oh, yes.

"Q. About how far away was it when you hollered at him? A. I should judge about fifteen or twenty feet,—I got off and hollered at him.

"Q. You jumped off the steps and hollered for the motorman to stop? A. Yes, sir.

"Q. And it was fifteen or twenty feet away? A. Yes, sir.

"Q. Did he stop? A. Well, he slowed down,—he was almost stopped when he hit the car.

"Q. But he did hit it? A. Yes, sir."

We think this evidence wholly fails to raise the issue of unavoidable accident, but, on the contrary, shows conclusively that the collision was the result of negligence on the part of the motorman in failing to keep a proper lookout. The evidence as a whole fails to suggest any excuse for the failure of the motorman to see the standing coach. The track was straight for a sufficient distance for him to see the coach and stop the bus before the collision. Unquestionably it was the duty of the motorman to keep a proper lookout while backing into the station. It being the duty of the motorman to keep a proper lookout, it was negligence for him to fail to look or to see the coach

which was plainly visible. Woods v. Moore (Mo.App.) 48 S.W.(2d) 202.

 Appellant's third assignment of error is as follows: "The district court of Bowie county, Texas, erred materially in permitting the witness J. A. Johnson to testify over the objection and exception of defendant that during the period Jim Varnell lived on his farm, he was not in good health and was not able to do much work because such testimony was merely the opinion and conclusion of a nonexpert or lay witness based upon undisclosed facts." The record shows that the appellee's injury was received November 10, 1933; that appellee lived on the witness' farm in 1934; that witness had known the appellee for several years and knew appellee before the injury to be a strong man and a good worker. In view of these facts it seems to us under the following authorities that the court did not err in admitting the testimony complained of over the objection made. England v. Pitts (Tex.Civ.App.) 56 S.W.(2d) 493; 19 Tex.Juris. § 231, p. 354.

Finding no error in the record, the judgment of the trial court is affirmed.